BRENDA SATTERWHITE,                  )
                                     )
        *Plaintiff,*                 )
                                     )        Case No. 1:06-cv-165
v.                                   )        Judge Mattice
                                     )
METROPOLITAN LIFE INSURANCE ,        )
COMPANY, *et al.*,                   )
                                     )
        *Defendants.*                )

## MEMORANDUM AND ORDER

Brenda Satterwhite brings this action against Metropolitan Life Insurance Company, the Long Term Disability Plan for Employees of the U.S. Enrichment Corporation, and the United States Enrichment Corporation alleging a cause of action under 29 U.S.C. § 1132(a)(1)(B).

Before the Court is the Motion for Judgment on the Pleadings [Court Doc. No. 13], pursuant to Federal Rule of Civil Procedure 7(b) and the procedures set forth by the United States Court of Appeals for the Sixth Circuit in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998) by which the Plaintiff seeks to have the Court overrule Defendant's decision to terminate her long-term disability benefits.

For the reasons explained below, the Plaintiff's Motion for Judgment on the Pleadings is **GRANTED** and this case is **REMANDED** to Metropolitan Life for a full and fair review of the administrative record.

## I.    STANDARD OF REVIEW

A claim under 29 U.S.C. § 1132(a)(1)(B) for denial benefits is to be reviewed "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the administrator or fiduciary is afforded discretion by the plan, the decision is reviewed under the arbitrary and capricious standard.  *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006). The parties here agree that Metropolitan Life's Plan affords deference to the administrator. The Court will therefore conduct its review under the arbitrary and capricious standard.

Under 29 U.S.C. §1132(a)(1)(B), a court's review is limited to the administrative record as it existed when the plan administrator made its final decision.  *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378-79 (6th Cir. 2005).  The arbitrary and capricious standard is one of the least demanding forms of review.  *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003).  "Nevertheless, merely because our review must be deferential does not mean our review must also be inconsequential." *Id.*  A court must "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id.* at 172.  If the administrative record does not show that the administrator offered a "reasoned explanation" based on substantial evidence, the decision is arbitrary or capricious.  *Moon*, 405 F.3d at 379.  Substantial evidence means "much more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McDonald*, 347 F.3d at 171.

## II.    FACTS

Brenda Satterwhite worked for U.S. Enrichment Corporation's (USEC) Paducah Gaseous Diffusion Plant as a Health Physics Technician until October 12, 2001. (Administrative Record ("A.R.") 260.)

### A.    USEC's Long Term Disability Plan

USEC maintains a long-term disability plan ("Plan") for its employees that is administered by Metropolitan Life Insurance Company (MetLife). (A.R. 123-26, Plan 252-53.)  The Plan states:

> Under the Long Term Disability Plan, you are considered totally disabled during your first 24 months of Long Term disability if you are unable to perform the duties of your regular job with the Company due to illness or injury and are under the regular care of a licensed practicing physician.
> ...
>
> After you have received Long Term Disability benefits for 24 months, you are considered totally disabled if you remain under the regular care of a licensed practicing physician and you are unable to work at any job for which you might be qualified based on your education, training and experience.  In order to continue receiving benefits, you must furnish periodic medical evidence of your illness or injury if requested by the Company.

(Plan 123.)

### B.    Satterwhite's Initial Diagnosis, Treatment, and Disability Award.

Satterwhite filed for short-term disability benefits due to depression in October 2001. (A.R. 254-55.) Her application was accompanied by the physician statement of Dr. Banister, which diagnosed her with depression and indicated that she could not work "at that time" but estimated that she could likely return to normal work in six weeks. (*Id.*)  The next month, Dr. Meals requested that Satterwhite be excused from work until December 31, 2001 due to her treatment for depression. (*Id.* at 219.) Dr. Meals also referred

Satterwhite to a psychiatrist, Dr. Meyer, for an evaluation. (*Id.* at 217.) Dr. Meyer diagnosed Satterwhite as having "Major depression, moderate to severely moderate" and found her to have a Global Assessment of Functioning Score (GAF) of 52. (*Id.* at 218.) He noted that she was "not psychotic" and recommended treatment with Effexor and Ambien. (*Id.*)

After receiving Dr. Meyer's evaluation, MetLife arranged for a non-treating psychiatrist, Dr. Frye, to conduct an Independent Psychiatric Examination (IPE) of Satterwhite. (A.R. 203-05.) Dr. Frye reviewed Satterwhite's full medical records and interviewed her in person for six hours. (*Id.* at 187-90.) Dr. Frye found that Satterwhite was "entrenched in her conviction that she cannot return to work at USEC" and that her conviction was "psychologically driven, rather than work related." (*Id.* at 191.) Dr. Frye conducted two personality tests which showed that Satterwhite was "experiencing difficulties consistent with depression, anxiety, and agoraphobia (fear of being around other people)" and that she was possibly experiencing a psychotic process. (*Id.* at 193.)

Dr. Frye diagnosed Satterwhite with a delusional disorder, a personality disorder, and stated that Satterwhite was "currently experiencing significant psychological difficulties which include anxious, phobic and depressive symptoms." (*Id.*) Dr. Frye found Satterwhite's GAF score was 50. (*Id.*) Dr. Frye recommended that Satterwhite's "possible psychotic process" be treated or ruled out and stated that a trial of antipsychotic medications could potentially be very effective in treating Satterwhite's delusional disorder. (*Id.* at 194) Ultimately, Dr. Frye found that Satterwhite was "not likely to work successfully in any capacity" for at least two to four weeks. (*Id.*)

Following the receipt of Dr. Frye's IPE, MetLife approved Satterwhite's short-term

disability benefits. At the expiration of her short-term disability benefits, Satterwhite applied for long-term disability benefits. (A.R. 161-70.) Dr. Meyer, Satterwhite's treating physician, completed an attending physician statement that listed her diagnosis as "severe major depression." (*Id.* at 165.) The recommended treatment plan was a "high dose of Effexor and Wellbutrin and Lithium" with a possible trial of "MAOI." (*Id.* at 165.) Dr. Meyer also noted that Satterwhite was "not responding to aggressive treatment" and that she was "unresponsive to counseling." (*Id.*) Dr. Meyer characterized her psychological functioning as "Class 5 - Patient has significant loss of psychological, physiological, personal and social adjustment (severe limitations)" and noted that her condition was a "refractory, severe case so far." (*Id.*) Dr. Meyer estimated that Satterwhite could work zero hours a day and stated that he had not advised Satterwhite to return to work as she had not yet responded to treatment. (*Id.* at 166.) On this evidence, MetLife approved Satterwhite's long-term disability claim, stating that she would be entitled to benefits until she recovered, was denied second phase approval, died or reached age 65. (*Id.* at 243.)

As required by the Plan, (Plan 125) Satterwhite pursued a disability claim with the Social Security Administration. (A.R. 154-57.) Total disability was awarded to her in early 2003. (*Id.* at 4-5, 139-43.) Per the terms of the Plan, (Plan 125) MetLife began offsetting the amount it paid to Satterwhite by the amount that she received from Social Security. (A.R. 5.)

In August 2003, MetLife began reviewing Satterwhite's file to determine if she was eligible for phase two benefits - those awarded if a claimant is unable to perform any job - which would take effect in April 2004. (*Id.* at 130.) MetLife requested Dr. Meyer's office

notes, testing results, recommended restrictions and limitations, and asked Dr. Meyer to complete a behavioral health form that it provided. (*Id.*) MetLife also asked Dr. Meyer to determine whether Satterwhite could not perform only her prior job or whether she could not perform any job. (*Id.*) If Dr. Meyer determined that Satterwhite could not perform any job, he was required to submit "specific clinical reasons, factors and/or complications preventing (Satterwhite) from returning to the workforce." (*Id.* at 131.)

Dr. Meyer completed the required behavioral health form, stating that Satterwhite's condition was "very severe; among the most severe in my large practice of > 1000 pts." (A.R. 107.) He listed her most recent GAF score as 50 and categorized her impairment as moderately severe or severe in thirteen of sixteen categories. (*Id.* at 108.) Dr. Meyer noted that Satterwhite had "poor concentration, anxiety, low energy" and that she was "too depressed to work with <u>any</u> accommodation." (Emphasis in original.)  (*Id.* at 109.) He responded that Satterwhite could not perform her prior job in another department or division or even for another employer and estimated her return to work date as "never." (*Id.*) Dr. Meyer also submitted his office notes and other requested information, stating that Satterwhite's "prognosis for returning to work, unfortunately, is poor, and she is disabled and unable to perform any job." (*Id.* at 99.)

In January 2004, MetLife referred Satterwhite's file to a nurse consultant for a transition review.  The nurse consultant noted that "med does seem to support disab[ility]." (A.R. 7.)

MetLife again requested medical information from Satterwhite in March 2004, including her most recent treatment notes and any restriction and limitations. (A.R. 91.)

Due to confusion over whether Satterwhite had relocated and was under the care of another physician, MetLife temporarily suspended her disability benefits on April 14, 2004 for lack of information. (*Id.* at 89-90.) Satterwhite responded with a statement indicating that Dr. Meyer was still her treating physician and included Dr. Meyer's most recent treatment notes. (*Id.* at 85-88.) Based on that information, MetLife approved Satterwhite's disability under the more strenuous "any job" phase two disability standard. (Plan123, A.R. 14.) MetLife noted that Satterwhite's medication supported her disability and indicated it was severe enough to prevent her from returning to work. (A.R. 14) MetLife's notes state that the administrator should follow-up in nine to twelve months for updated medical information. (*Id.* at 19.)

In March 2005, MetLife issued another request for information. (*Id.* at 78.) It asked Satterwhite to provide her treatment notes from October 2004 through March 2005, her most current restrictions and limitations, her current GAF score, and asked to have an enclosed behavioral assessment form completed. (*Id.* at 19, 78.) Dr. Meyer completed the requested form, noting that Satterwhite's GAF score was 45 and that her condition was "severe, chronic, refractory." (A.R. 73.) He stated that Satterwhite had "no energy", that she had to "push self to get out of bed" and that she hated to leave the house and was "not social." (*Id.*) Dr. Meyer claimed that Satterwhite would be "a fatigued, inattentive employee prone to absenteeism and accidents." (*Id.*) Dr. Meyer indicated that he was seeing Satterwhite every two to three months and estimated that Satterwhite would never be able to return to work. (*Id.*) MetLife called Dr. Meyer's office and confirmed the information he had submitted. (*Id.* at 22.) On the basis of this information, MetLife approved Satterwhite's

claim stating "medical supports to 8/31/05." (*Id.*)

On August 11, 2005 MetLife again requested current medical information for Satterwhite. (A.R. 63.) In a fax sent directly to Dr. Meyer's office, MetLife requested Satterwhite's progress/office notes from March 2005 to August 2005, the frequency of her visits including her next scheduled office visit date, and her current treatment plan including medications and dosages. (*Id.*) MetLife did not include a form for Dr. Meyer or Satterwhite to complete nor did it request a GAF score or other objective indicators of mental impairment. (*Id.*) Dr. Meyer provided MetLife with the requested information on August 15, 2005. (*Id.* at 64-66.)

## C.    MetLife's Denial of Benefits and Appeal

On October 4, 2005, MetLife notified Satterwhite that it was terminating her benefits effective August 31, 2005. (A.R. 59.) This initial denial letter states that a "clinical specialist" reviewed the information submitted by Dr. Meyer on August 15, 2005 and his office notes from May and July 2005. (*Id.*) The letter went on to recount the details from the May and July office visit notes almost verbatim and concluded that "there is not enough evidence to support a global severity if (sic) impairments from a psychiatric disorder that would prevent you from performing your occupational duties." (*Id.* at 60.) The letter also stated:

> Dr. Meyer has not provided objective findings that indicate an inability to function on a global level.  There is no mental status exam indicating functional impairments.  The notes do not provide any global assessment of functioning score, nor do the notes provide any specific details of why you are unable to perform any occupation.  Dr. Meyers (sic) indicates you were attending treatment with him every three months and there is no evidence that you were being followed between appointments by a therapist or counselor.  This does not indicate a severity of symptomology.

(*Id.*)

Satterwhite appealed MetLife's revocation of her disability claim and included a letter written by Dr. Meyer on October 15, 2005 in support of her appeal. (A.R. 56-58.) Dr. Meyer emphasized that the office notes he had provided were his treatment notes and were not written for the purpose of defending a disability claim. (*Id.* at 56.) He opined that Satterwhite "belongs in a group of patients in my practice with refractory depression. They have tried every medication, alone and in combination, that I have recommended, but they remain seriously depressed and functionally impaired." (*Id.*) Dr. Meyer claimed that Satterwhite "is definitely not a patient who exaggerates her symptoms, nor is she a patient who calls frequently with minor problems" instead, she "prefers social isolation, even at times to the exclusion of her own children." (*Id.*) Dr. Meyer explained the negative effect that Satterwhite's condition was having on her marriage, her family, and her overall existence. (*Id.*) Dr. Meyer concluded:

> Based on the above, there is no doubt in my mind that she continues to be disabled for any occupation. I have tried everything I know to do in aggressively treating her but, as I said, she belongs to the unfortunate minority of patients in my practice who basically do not respond to anything despite her best efforts, and mine as well.

(*Id.* at 57.)

As part of its review of Satterwhite's appeal, MetLife referred Satterwhite's claim to Dr. Leonard Kessler, a board-certified psychiatrist for a file-only review. (A.R. 53-54.) MetLife's referral memorandum to Dr. Kessler stated that he did not need to contact Satterwhite's treating physician, Dr. Meyer, unless he thought it was necessary. (*Id.* at 44.) Dr. Kessler did not personally examine Satterwhite or consult with Dr. Meyer or Dr. Frye prior to issuing his report to MetLife.

Dr. Kessler concluded that Satterwhite had "received minimal and incomplete treatment" with "no documentation to show the presence of any impairments in cognition nor the presence of any significant functional limitations beyond 9/1/05." (A.R. 54.) Dr. Kessler stated:

> It would appear that both the claimant and her treating psychiatrist have decided that she would not return to a perceived hostile work environment, despite her having no treatment which addressed relevant occupational issues and her proclivity toward paranoid thinking. Treatment is, thus, seen as incomplete and lacking in appropriate therapy and focus upon issues addressed by Dr. Frye in 2002.

(*Id.*)

MetLife upheld its original decision to revoke Satterwhite's disability benefits in a letter dated December 20, 2005. (A.R. 47-49.) This second denial letter stated that MetLife had reviewed Satterwhite's entire claim and briefly recounted her claim status. (*Id.* at 47-48.) The letter then explained MetLife's basis for upholding the revocation of her benefits and concluded:

> Review of the information on record is insufficient to support a severity of functional impairment that would preclude you from performing the duties of your regular job with the Company. Review of the information on record also does not support a severity of functional impairment that would preclude you from performing work at your job or any other job for which you might be qualified based on your education, training, and experience. Therefore, you can not be considered disabled as defined by your employer's Plan, and the original claim determination was appropriate.

(*Id.* at 49.)

Satterwhite filed a complaint in this Court under 29 U.S.C. § 1132(a)(1)(B) for wrongful denial of benefits. Satterwhite moved for Judgment on the Pleadings (essentially a request for judgment on the administrative record) [Court Doc. No. 13] and oral argument was heard on April 13, 2007.

### III.    ANALYSIS

In considering whether the decision to revoke Satterwhite's disability benefits was arbitrary and capricious, the Court must evaluate the reasonableness of each relevant step in the decision-making process. *See Elliott v. Metropolitan Life Insurance Co.*, 473 F.3d 613, 618-19 (6th Cir. 2006) (reviewing for reasonableness both Defendant's initial denial letter and its letter affirming denial on appeal). MetLife's conclusions leading to its decision to revoke Satterwhite's disability benefits must have been supported by substantial evidence based on whatever information was available to it. It is not enough for MetLife to offer an explanation for the revocation of benefits, "the explanation must be consistent with the 'quantity and quality of the medical evidence' that is available on the record." *Moon v. Unum Provident Corp.*, 405 F.3d 373. 381 (6th Cir. 2005) (quoting *McDonald*, 347 F.3d at 172).

### A.    MetLife's Basis For Denial Outlined in the First Denial Letter Was Arbitrary and Capricious.

MetLife issued its first denial letter on October 4, 2005. (A.R. 59.) MetLife's rationale for revocation of Satterwhite's disability benefits was that her file did not indicate a "severity of symptomology" and that she had not provided adequate medical support for her continued disability. (*Id.* at 60.) The Court finds that MetLife's deliberation process and its ultimate conclusion were arbitrary and capricious for a number of reasons, which are discussed below.

The United States Court of Appeals for the Sixth Circuit has held that an administrator must consider the entire record available in making its benefits determination. *See Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 359-62 (6th Cir. 2002)

(holding that selective review of the administrative record is inappropriate). MetLife's initial denial letter explicitly states that a "clinical specialist" reviewed the August 15, 2005 letter from Dr. Meyer as well as Dr. Meyer's office notes from the May and July appointments. (A.R. 59.) There is no indication that the specialist reviewed any other information in Satterwhite's file before determining that "there is not enough evidence to support a global severity if (sic) impairments from a psychiatric disorder that would prevent you from performing your occupational duties." (A.R. 60.) MetLife's initial denial was therefore not based on an appropriate review of Satterwhite's entire file.

The first denial letter also listed what MetLife apparently considered missing medical evidence. (A.R. 60.) It faulted Dr. Meyer for not providing "objective findings that indicate an inability to function on a global level." (*Id.*) MetLife noted that the information it reviewed did not contain a mental status exam, global assessment of functioning score, or specific details for why Satterwhite was unable to work. (*Id.*)

Under the terms of the Plan, Satterwhite is required to "furnish periodic medical evidence of (her) illness or injury if requested by the Company." (Plan 123.) On August 11, 2005, MetLife invoked its right to request medical information in a fax asking Dr. Meyer to send the following: "Most current progress/office notes from March 2005. Frequency of visits including next office visit date. Current treatment plan including medications and dosages." (A.R. 63.) Dr. Meyer responded on August 15, 2005 by furnishing MetLife with the following: Satterwhite's medication list, treatment plan, and the date of her next office visit. (*Id.* at 64.) His office notes from her May and July visits were attached. (*Id.* at 65-66.) There is no indication in the record that MetLife attempted to obtain more information from Dr. Meyer or Satterwhite prior to issuing the first denial letter.

-12-

A review of the entirety of Satterwhite's medical file shows that Satterwhite and Dr. Meyer have regularly responded to MetLife's information requests by providing the required information.[1] (A.R. 73-75, 98-103, 91-95.) Had MetLife reviewed the entirety of Satterwhite's medical file, it would have found a GAF score of 45 from March 2005. (*Id.* at 73.) The behavioral assessment form also completed in March 2005 listed specific reasons that Satterwhite could not return to work. (*Id.*) The objective evidence that MetLife sought was therefore in Satterwhite's file. MetLife's decision to ignore medical evidence readily available to it in Satterwhite's file was arbitrary and capricious.

MetLife's first denial letter faulted Satterwhite and Dr. Meyer for not providing information that it did not seek. Under the terms of the Plan, Satterwhite is required to provide whatever periodic medical evidence is *requested by MetLife*. (Plan 123 (emphasis

---

[1]MetLife argues that its denial of benefits was justified, in part, because Dr. Meyer never provided a mental status exam that it requested. (Defendant's Response to Motion for Judgment on the Administrative Record ("Def. Br.") [Court Doc. No. 15] at 7.) MetLife's March 2005 information request asked Dr. Meyer to complete an enclosed behavior assessment form, submit his most recent office notes, provide Satterwhite's current restrictions and limitations, and provide a current GAF score. (A.R. 78.) At the end of the behavior assessment form, there is a note for the assessor, in this case Dr. Meyer, to provide a copy of his past two months office notes "to include a complete mental status exam, and the date it was completed." (*Id.* at 74.) Dr. Meyer completed the behavioral assessment form, attached the requested office notes, and provided the GAF score but there is no mental status exam in his office notes. (*Id.* at 73-75.) There is also no indication that MetLife asked Dr. Meyer for this missing information, even though a MetLife employee contacted Dr. Meyer's office to follow-up on other issues arising out of the same information request. (*Id.* at 22.) There is also no indication that MetLife informed Satterwhite that it had not received her mental status exam even though it contacted her in April to follow-up on the information provided by Dr. Meyer. (*Id.*) MetLife claims that Satterwhite didn't meet her burden of supplying the required information necessary to maintain her disability claim. The Court, however, is not convinced that the lack of one mental status examination, considered in light of the entire medical record, necessitates a finding that Satterwhite failed to provide adequate medical evidence to support her claim.

-13-

added.)) There is no burden on Satterwhite to proactively prove her disability on a continuing basis. If MetLife felt that it needed a more recent report of Satterwhite's mental status findings or a more explicit report of her functional limitations, it had the right and obligation to request such information from Satterwhite. (*Id.*) MetLife cannot shift its burden of requesting information to Satterwhite and argue that she failed to provide adequate information to support her disability claim. It was therefore unreasonable for MetLife to rely on a supposed lack of information to revoke Satterwhite's disability benefits.

MetLife's initial denial letter also noted that Satterwhite was seeing Dr. Meyer only every three months, that there was no documentation of interim counseling or therapy, and concluded that "(t)his does not indicate a severity of symptomology." (A.R. 60.) Dr. Meyer's notes indicated that Satterwhite stopped going to counseling because she "did not respond." (*Id.* at 166.) A review of the record shows that the frequency of Satterwhite's visits to Dr. Meyer tapered off as Dr. Meyer's notes stated that she was not responding to treatment. (*Id.* at 166, 107.)

Although the Plan requires an individual to be under the "regular care of a licensed practicing physician," it does not define "regular care." (Plan 123.) The Court cannot say that an individual who has been unresponsive to treatment over a three year period is not under the "regular care" of a physician if she is treated every three months. *See*, *e.g., Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 841 (8th Cir. 2001) (rejecting argument that benefits could be denied because individual was no longer under a physician's "regular care" as an invalid basis for terminating benefits when the record showed that the individual had been treated by his doctor six months prior and there was

no evidence that additional doctor visits would influence the progression of the disabling injury).

MetLife's conclusion that "there is a lack of medical evidence which would indicate a severity of symptoms, cognitive impairments, and specific restrictions or limitations that would prevent you from performing the essential duties of any occupation" is arbitrary and capricious. MetLife based its decision on only a small portion of Satterwhite's medical records and faulted Satterwhite for a lack of information that it had not requested, as required by the Plan. (A.R. 60, Plan 123.) Considering the entire administrative record, MetLife's initial denial of Satterwhite's claim cannot be said to have been the result of reasoned decision-making process and is therefore arbitrary and capricious.

## B. The Basis for Denial Outlined in MetLife's Second Denial Letter was Arbitrary and Capricious.

Satterwhite appealed MetLife's decision to terminate her benefits. (A.R. 56.) Dr. Meyer wrote a letter on her behalf that further outlined Satterwhite's medical condition, the effect her condition had on her family and her daily life, and emphasized his diagnosis that she was completely and totally disabled. (*Id.* at 57-58.) To assist with reviewing her claim, MetLife had Satterwhite's file reviewed by an Independent Physician Consultant, Dr. Kessler. (*Id.* at 47-48.) On December 20, 2005, MetLife issued its decision to deny Satterwhite's appeal. (A.R. 47-49.)

Satterwhite asserts the Court must take into account any conflict of interest on the part of MetLife and Dr. Kessler in determining whether MetLife engaged in a principled reasoning process. (Plaintiff's Motion for Judgment on the Pleadings ("Pl. Br.") [Court Doc. No. 14] p. 9.) Where the same entity both funds and administers a plan there is an "actual,

readily apparent conflict . . . not a mere potential for one." *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527 (6th Cir. 2003). In this case, USEC funds the Plan and has contracted with MetLife to administer the Plan. (Plan 241, 252.) This delegation of duties supports a conclusion that there is not a conflict of interest. *Smith v. Bayer Corp.*, 444 F.Supp.2d 856, 870-71 (E.D. Tenn. 2006).

While it may not rise to the level of a conflict of interest, however, that is not to say USEC has no influence over the administration of the disability plan. The record shows that a USEC employee contacted MetLife and was "very concerned" about Satterwhite's claim. (A.R. 10.) After this phone call, MetLife's notes show that its nurse consultant began questioning Satterwhite's disability and considering the possibility of obtaining an independent medical examination. (*Id.* at 11.) While this is not sufficient evidence to declare that MetLife was biased, it is a factor for the Court to consider in its analysis of whether MetLife acted arbitrarily and capriciously in denying benefits to Satterwhite.

With regard to Dr. Kessler, there is no evidence that MetLife or USEC attempted to interfere with or influence his report. Even so, the Supreme Court has recognized that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers' money and preserve their own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965 (2003). The Sixth Circuit has also recognized that "a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a 'clear incentive to contract with individuals who were inclined to find in its favor that (a claimant) was not entitled to continued benefits." *Calvert v. Firstar*

*Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).   In this case, Satterwhite has not presented any evidence showing the number of times that MetLife has contracted with Dr. Kessler to perform an independent psychiatric evaluation.  Satterwhite therefore has not developed the record to the point that the Court is convinced that it must consider Dr. Kessler's report and findings biased.  *See Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005). However, the fact that Dr. Kessler's report was commissioned by MetLife is a factor in the Court's analysis of whether MetLife acted arbitrarily and capriciously.  *Id.*

Satterwhite also contends that "MetLife's decision-making process terminating benefits in the end rest[ed] entirely upon a file review by Dr. Kessler." (Pl. Br. at 13.)  The Court agrees, noting that MetLife's second denial letter tracks, almost verbatim, the analysis and conclusions in Dr. Kessler's report. (A.R. 48-49, A.R. 42-43.)  Therefore, whether MetLife's decision to uphold its revocation of Satterwhite's benefits on appeal was arbitrary and capricious depends, in large part, upon whether Dr. Kessler's report was reliable evidence.  *See Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir. 2006) ("Because MetLife's initial denial lacked a reasoned basis, MetLife's second denial can only be characterized as 'reasoned' if Dr. Menotti's review provided an adequate basis to conclude that Elliott could perform her occupation despite her medical condition.")

Under the terms of the Plan, MetLife had the right to "consult with a health care professional who was not consulted in connection with the denial that is the subject of the appeal, is not the subordinate of anyone who was consulted, and who has the appropriate training and experience in the field of medicine involved in the medical judgment." (Plan 218.) MetLife's commission of Dr. Kessler's file-only review was therefore allowable under

the terms of the Plan. An administrator, however, cannot blindly rely on the advice of an expert, it must ensure that its reliance is "reasonably justified" under the circumstances. *Chao v. Hall*, 285 F.3d 415, 430 (6th Cir. 2002).

Satterwhite argues that MetLife wrongfully ignored her treating physician's diagnosis that she continued to be totally disabled. (Pl. Br. 10.) While the Supreme Court has held that in ERISA cases, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965 (2003), it has also said that administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*

It is not apparent from the record what evidence MetLife considered in determining that Dr. Kessler's conclusions were more reliable than Dr. Meyer's determination that Satterwhite was disabled. MetLife was not required to credit Dr. Meyer's conclusions over Dr. Kessler's determinations. *Nord*, 538 U.S. at 834. Without providing a rational basis for doing so, however, MetLife cannot arbitrarily refuse to credit Dr. Meyer's findings, diagnosis, and treatment plan. *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006) (finding administrator's decision to reject treating physician without offering any reason showed that it had not engaged in a "principled reasoning process.") *See also Smith v. Bayer Corp. Long Term Disability Plan*, 444 F.Supp.2d 856, 871 (E.D. Tenn. 2006) (discrediting non-examining physician who did not fully analyze the data available

to him but summarily rejected the treating physician's findings altogether).

MetLife adopted Dr. Kessler's determinations wholesale and rejected Dr. Meyer's opinion out-of-hand in its second denial letter. (A.R. 47-49.) It has not shown that it had a reasoned, rational basis for crediting Dr. Kessler over Dr. Meyer. The Court therefore considers MetLife's refusal to credit Dr. Meyer's reliable evidence a factor in favor of a finding that MetLife acted in an arbitrary and capricious manner. *See Kalish v. Liberty Mutual*, 419 F.3d 501, 510 (6th Cir. 2005) (discrediting non-examining physician who failed to rebut treating physician's diagnosis and conclusions); *Elliott*, 473 F.3d at 620 ("that MetLife gave 'greater weight' to a non-treating physician's opinion for no apparent reason lends force to the conclusion that MetLife acted arbitrarily and capriciously.")

Satterwhite also argues that Dr. Kessler's report misconstrues the record and that Dr. Kessler's conclusions are "unreasonable." (Pl. Br. 18.) Dr. Kessler's two-page report stated that Satterwhite received "minimal and incomplete treatment" and that there was "no documentation to show the presence of any impairments in cognition nor the presence of any functional limitations" beyond September 2005. (A.R. 43.)

Much of Dr. Kessler's criticism arises out of the lack of information in Satterwhite's file. (A.R. 42-43.) However, as discussed above in Section III.A., MetLife cannot shift its burden of requesting information to Satterwhite. Accordingly, Dr. Kessler's criticisms in this regard will be disregarded by the Court.

This is not to say that the Court finds that Dr. Kessler's report is completely unreliable. There is some support for his conclusions in the record. (A.R. 42-43.) The standard here, however, is not whether there is *any* support in the record for his

conclusions; rather, the Court must "determine whether an explanation is reasoned" by asking whether "in light of the administrative record as a whole," the conclusions are rational. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005). *See also Smith v. Bayer Corp.*, 444 F.Supp.2d 856, 875 (E.D. Tenn. 2006) (discrediting non-examining doctors because they "cherry-picked" certain parts of the claimant's medical records to support their positions in lieu of actually evaluating the claimant). The Sixth Circuit has held that there must be substantial evidence to support a basis for the revocation of benefits, meaning "more than a mere scintilla." *McDonald*, 347 F.3d at 171.

The Court's review of the entire administrative record reveals that there is a significant amount of evidence that Dr. Kessler appears to have overlooked or misconstrued. In fact, the bulk of the evidence in the record is contrary to Dr. Kessler's assertions.[2] Dr. Kessler ignored much of the objective evidence in the record, not even mentioning it in his review of the file. (A.R. 42-43.) Dr. Kessler answered the questions posed to him by MetLife with conclusory statements that do not reflect the factual analysis

---

[2]Dr. Kessler based his conclusion that Satterwhite's treatment was minimal, in part, because Dr. Meyer did not change his treatment plan when Satterwhite did not respond to medication alone. (A.R. 56.) But the record shows that Dr. Meyer did discuss various treatment plans with Satterwhite, including taking Monoamine Oxidase Inhibitors (MAOIs) and Electroconvulsive Therapy (ECT). (A.R. 74, 101.) It is apparent from the record that Satterwhite's asthma prevents her from being able to take MAOIs, which are powerful anti-depression drugs. (A.R. 74.) Dr. Kessler also criticized the fact that Dr. Meyer had not explained why he did not pursue ECT treatment for Satterwhite. (A.R. 43.) The record shows that MetLife was aware that Dr. Meyer had discussed ECT with Satterwhite and that she had declined to pursue it. (A.R. 9.) The Supreme Court has recognized that a competent individual's right to refuse "mind altering" treatments such as ECT is a "fundamental liberty interest deserving of the highest order of protection." *Washington v. Harper*, 494 U.S. 210, 241, 110 S.Ct. 1028 (1990). Satterwhite's refusal to consent to ECT therefore cannot be a reasonable basis for concluding that her treatment was incomplete or for revoking her disability benefits.

upon which they are based. (*Id.* at 43.) These conclusory statements do not rebut the objective evidence in the record and, therefore, do not form a reliable basis upon which MetLife may rely in revoking Satterwhite's benefits. *Smith v. Bayer Corp.*, 444 F.Supp.2d 856 (E.D.Tenn. 2006) (finding arbitrary and capricious an administrator's reliance on independent file-only reviews where the psychiatrist ignored objective evidence, offering instead a merely conclusory statement that the claimant can return to work).

Considering both the quantity and quality of the medical evidence, the Court finds that Dr. Kessler's report is not reasonably based on the entirety of the administrative record and should be afforded little weight.

Satterwhite also argues that MetLife should not have relied on Dr. Kessler's conclusions because Dr. Kessler conducted only a file review of Satterwhite's claim. (Pl. Br. 13.) "Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005). Although the Sixth Circuit has held that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," it has also held that "failure to conduct a physical examination - especially where the right to do so is specifically reserved in the plan - may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295-96 (6th Cir. 2005). Thus, while the fact that a reviewing physician conducted a file-only rather than a personal examination is not determinative, courts may properly consider the administrator's reliance

on a file-only review as a factor in determining whether the administrator acted in an arbitrary and capricious manner.  *Id.* at 295.

Dr. Kessler did not examine Satterwhite.  (A.R. 42.)  He also did not confer with Dr. Meyer about Satterwhite's condition.  (*Id.*)  The Court therefore determines that  MetLife's heavy reliance on Dr. Kessler's file-only report is a factor in favor of a finding that MetLife acted in an arbitrary and capricious manner.  *See Smith v. Continental Casualty Co.*, 450 F.3d 253, 262-63 (6th Cir. 2006) (holding that a non-examining physician consultant's failure to conduct an interview with the examining physician "supports the contention that [the administrator's] determination was arbitrary and capricious.")

Satterwhite argues that MetLife's reliance on a file-only review was, in this case, even more egregious because Satterwhite's disability stems from a mental condition. (Pl. Br. 15-16.) While disclaiming any pretensions to medical expertise, the Court is persuaded that there may be a significant difference between a non-examining doctor reviewing the file of a patient suffering from a purely physical disability and a psychiatrist attempting to ascertain the severity of a mental illness.  As one court has noted:

> Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms . . . depression, fear of death, and anxiety, among others. Physicians do not diagnose or evaluate these different conditions in the same way. It matters not if a patient with ischemia, ventricular scarring, or atrial fibrillation is depressed or elated; an echocardiogram or stress test will reveal his condition. It matters not if a patient with arthritic spinal degeneration or scoliosis fears death or believes himself immortal; an x-ray or MRI will reveal his condition. . . when a psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes.

*Sheehan v. Metropolitan Life Insurance Co.*, 368 F.Supp.2d 228, 255 (S.D.N.Y. 2005) (internal citations omitted).

Although the Sixth Circuit has not yet directly addressed this issue, it has noted that where "credibility determinations regarding a claimant's medical history and symptomology" are required, reliance on a file-only review "may be inadequate." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 (6th Cir. 2005). As the court in *Sheehan* noted, a psychiatrist evaluating a patient's mental health relies heavily on their ability to observe the patient's mannerisms, demeanor, and expressions and therefore inherently involves credibility determinations. Based on this, the Court concludes that under Sixth Circuit precedent a file-only review may be inadequate in cases involving the patient's mental status. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 (6th Cir. 2005). Other district courts in the Sixth Circuit have agreed with this conclusion. *See also Smith v. Bayer Corp.*, 444 F.Supp.2d 856, 873-74 (E.D. Tenn. 2006) (quoting *Sheehan* and discrediting non-examining psychiatrist report for making conclusory statements and judgment calls about the claimant that would required personal examination); *Soltysiak v. UnumProvident Corp.*, 2006 WL 2884461 (W.D.Mich. 2006) (finding denial of benefits arbitrary and capricious where administrator credited non-examining psychiatrist over treating psychiatrist); *Platt v. Walgreen Income Protection Plan For Store Managers*, 455 F.Supp.2d 734, 745 (M.D.Tenn. 2006) (finding that administrator's consulting doctors "were not free to discredit Plaintiff's subjective complaints of pain or its impact on her physical capacity without a physical examination"). Although not dispositive, the Court finds MetLife's reliance on Dr. Kessler's file-only review particularly troublesome considering the nature of Satterwhite's

disability.

This case is similar to *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161 (6th Cir. 2003), where the Sixth Circuit held that a plan administrator's decision to revoke long-term disability benefits was arbitrary and capricious. McDonald was originally diagnosed with depression and placed on short-term disability in 1988. He was later found totally and completely disabled by the Social Security Administration and approved for long-term disability benefits by Western-Southern based on his depression and aggressive personality disorder. Independent medical examiners in 1989 and 1994 confirmed the treating physician's determination that McDonald was completely disabled and unable to work in any position.

In 1996, Western-Southern requested medical information from McDonald to evaluate his continued eligibility for benefits. The administrator felt that some of the information provided by McDonald was inconsistent with a diagnosis of total disability and requested another independent medical examination. Without conducting a personal examination of McDonald, this third independent medical examiner opined that he was fit to return to work. Based on this report, the administrator revoked McDonald's long-term disability benefits.

The Sixth Circuit held that the administrator's decision to revoke benefits based on this file-only medical review was arbitrary and capricious. The court discounted the doctor's opinion because it contradicted objective evidence showing that McDonald's depression had not improved as well as the opinion of McDonald's treating physicians and two prior independent medical examiners. *Id.* at 169-70. The Sixth Circuit also discredited the doctor's conclusory statement that McDonald could return to work without specifying

-24-

what kind of work McDonald could perform. *Id.* at 171-72. Based on the quantity and quality of the medical evidence in the administrative record as a whole, the *McDonald* court held that the administrator's revocation of benefits was arbitrary and capricious. *Id.* at 172.

Satterwhite argues that MetLife's failure to conduct an Independent Medical Examination (IME) shows that its review of Satterwhite's file was not thorough. (Pl. Br. 17.) Discussing a plan's refusal to obtain an IME, the Sixth Circuit recently stated that "[a]lthough we continue to believe that plans generally are not obligated to order additional tests . . . plans can assist themselves, claimants, and the courts by helping to produce evidence sufficient to support reasoned, principled benefits determinations." *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). *See also Smith v. Continental Casualty Co.*, 450 F.3d 253, 264 (6th Cir. 2006) (holding that administrator's decision not to perform an independent medical examination "supports the finding that their determination was arbitrary.") This is especially true when the only medical evidence contradicting the treating physician comes from a non-examining consultant. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002) (finding that evidence in the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance company).

The record shows that MetLife considered getting an Independent Medical Examination for Satterwhite. (A.R. 11-13.) The Court finds compelling the fact that MetLife declined to obtain an IME, particularly considering its initial denial was based on a lack of information. *See Platt v. Walgreen Income Protection Plan for Store Managers*, 455

F.Supp.2d 734, 746 (M.D. Tenn. 2006) (administrator argued that it was justified in discrediting treating physician's diagnosis because treating physician had not provided adequate objective test results to support diagnosis and court rejected that argument, finding it "strange" that an administrator would rely on lack of evidence to deny claim but had declined to obtain an IME). The Court finds MetLife's reliance on a file-only review when it considered obtaining an IME to be a factor which militates in favor of a determination that MetLife's revocation was not the product of a deliberate, principled reasoning process. *Smith v. Continental Casualty Co.*, 450 F.3d 253, 264 (6th Cir. 2006) (holding that an administrator's decision not to perform an IME "supports the finding that their determination was arbitrary.")

MetLife also apparently disregarded the Social Security Administration's (SSA) determination that Satterwhite was completely disabled. (A.R. 47-49.) The Sixth Circuit has held that it is "totally inconsistent" to require a claimant to apply for Social Security disability benefits, avail itself of the SSA's determination and, at the same time, contend that the claimant is not disabled. *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, (6th Cir. 2003) (partially overruled on other grounds by *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965 (2003)). *See also Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (stating that "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, 'casts additional doubt on the adequacy of their evaluation of ... a claim, even if it does not provide an independent basis for rejecting that evaluation.'")(quoting *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998)).

Under the terms of the Plan, a beneficiary is required to apply for Social Security benefits and, if benefits are awarded, the amount paid out by the Plan is reduced by the amount received from the SSA. (Plan 125.) MetLife prompted Satterwhite to apply for SSA disability benefits and even referred her to an attorney to assist her. (Plan 125, A.R. 159-60.). MetLife offset its payment to her in the amount of her SSA award from 2002 until it revoked her benefits in 2005. (A.R. 4-5, 15.) There is nothing in the record showing that Satterwhite's SSA disability benefits have been revoked. MetLife therefore benefitted from Satterwhite's SSA disability determination for four years before declaring her not to be disabled and revoking her disability award. (A.R. 4-5, 15.) MetLife's inconsistency in this regard is a factor in the Court's arbitrary and capricious analysis.

Finally, the Court finds extremely compelling the fact that MetLife revoked Satterwhite's disability benefits although not a single doctor opined that she could return to work. Dr. Meyer has consistently declared Satterwhite totally disabled and stated that she could not work with any accommodation. (A.R. 57, 109.) Dr. Frye concluded that Satterwhite was "not likely to work successfully in any capacity." (*Id.* at 195.) MetLife's referral memorandum to Dr. Kessler did not ask him to opine whether Satterwhite could return to work. (*Id.* at 46.) Instead, MetLife requested that Dr. Kessler evaluate whether the medical information supported a psychiatric impairment beyond September 1, 2005. (*Id.*) Dr. Kessler responded that there was "no documentation to show the presence of any impairments in cognition nor the presence of any significant functional limitations." (A.R. 43.) But Dr. Kessler does not specifically say that Satterwhite is fit to return to her position at USEC or offer any examples of suitable job placements for Satterwhite. This lack of specificity further undermines the Court's perception of the relevancy of Dr. Kessler's

opinion. *See Smith v. Bayer Corp.*, 444 F.Supp.2d 856, 873 (E.D. Tenn. 2006) (discrediting non-examining physician's conclusion that claimant could return to work based on evidence that claimant could perform some everyday tasks unrelated to a job setting).

MetLife's second denial letter stated that Satterwhite's file "does not support a severity of functional impairment" that would preclude Satterwhite from "performing work at your job or any other job for which [she] might be qualified based on [her] education, training, and experience." (A.R. 49.) MetLife concluded that Satterwhite could not be considered disabled under the Plan and revoked her benefits. (*Id.*) MetLife's determination that Satterwhite could return to work is not based on the opinion of a medical professional. Instead, it flies directly in the face of the recommendations of both examining physicians. MetLife's self-serving conclusion that Satterwhite could return to work is therefore another strike against it in the Court's arbitrary and capricious analysis.

## IV.    CONCLUSION

In summary, MetLife's initial denial of Satterwhite's disability benefits was arbitrary and capricious because the administrator revoked Satterwhite's benefits based on its review of only a limited portion of the file and because MetLife attempted to shift its burden to request necessary information to Satterwhite. On appeal, MetLife relied heavily on a single piece of dubious evidence, the report of a non-examining psychiatrist hired by MetLife itself. MetLife ignored the recommendations of Satterwhite's treating physician without justification. It declined to have her independently evaluated and inconsistently benefitted from her SSA award while declaring her not to be disabled. MetLife's ultimate conclusion that Satterwhite could return to work is without support in the record.

Considering the quantity and quality of the medical evidence as a whole, the Court concludes that MetLife's revocation of benefits was arbitrary and capricious.

The Court directs that the case should be remanded to MetLife for a full and fair review of Satterwhite's disability claim. *See Smith v. Continental Casualty Co.*, 450 F.3d 253, 265 (6th Cir. 2006). "Such a remedy will allow for a proper determination of whether [the claimant] is entitled to long-term disability benefits." *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 623 (6th Cir. 2006). The Court is not a medical specialist and cannot say that Satterwhite continues to be disabled. *See id.* Both MetLife and Satterwhite, however, "would be well advised to pursue appropriate medical data." *Id.* Because the Court determines that a remand in Plaintiff's favor is appropriate, the Court need not reach Plaintiff's additional arguments that MetLife was required to show a medical improvement prior to revoking benefits. (Pl. Br. 10-12.)

For the reasons discussed above, Plaintiff's Motion for Judgment on the Pleadings [Court Doc. No. 13] is **GRANTED** and this case is **REMANDED** to Defendant for a full and fair inquiry into the administrative record.

SO ORDERED this 19th day of September, 2007.

                                          _____*/s/Harry S. Mattice, Jr.*_____
                                          HARRY S. MATTICE, JR.
                                          UNITED STATES DISTRICT JUDGE