UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| BRENDA SATTERWHITE, | ) | |
| | ) | |
|     *Plaintiff,* | ) | |
| | ) | Case No. 1:06-cv-165 |
| v. | ) | Mattice/Carter |
| | ) | |
| METROPOLITAN LIFE INSURANCE, | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
|     *Defendants*. | ) | |

## **REPORT AND RECOMMENDATION**

### I. Introduction

Brenda Satterwhite brings this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), following the termination of long term disability benefits under a disability benefit plan provided by her former employer. This action was originally filed on August 1, 2006, and was remanded by the District Court to MetLife, the plan administrator, for a full and fair review. Upon remand, MetLife has upheld its decision to terminate plaintiff's long term disability benefits, and the matter is once again before the District Court for review. For the reasons stated herein, the undersigned RECOMMENDS plaintiff's second motion for judgment on the pleadings [Doc. 44] be GRANTED and judgment be entered in favor of plaintiff on her claim for disability benefits.

1

## II. Background

*A. Statement of the Case- Before Remand.*

In its September 19, 2007 Memorandum and Order, the District Court set forth in detail the medical evidence relating to the plaintiff's depression and anxiety. In order to avoid omitting relevant evidence, or, in the alternative, simply restating the District Court's review of the medical evidence, the undersigned incorporates *in toto* the District Court's discussion of the medical evidence in this report and recommendation. (Sept. 19, 2007 Memorandum and Order, pp. 3-10, p. 15 regarding discussion of Dr. Meyer's Oct. 31, 2005 letter; Doc. 20; hereinafter referred to as the "September 2007 Decision").

Brenda Satterwhite brings this action against Metropolitan Life Insurance Company (MetLife), the Long Term Disability Plan for Employees of the U.S. Enrichment Corporation, and the United States Enrichment Corporation (USEC). It is uncontested that USEC funds the disability plan at issue (hereinafter referred to as "the Plan"), and MetLife administers it.

Ms. Satterwhite worked for USEC's Paducah Gaseous Diffusion Plant as a Health Physics Technician until October 12, 2001. Satterwhite filed for short-term disability benefits due to depression and anxiety in October 2001. (A.R. 254-55.) Met-Life subsequently granted her claim for short-term disability benefits on the ground that she was unable to perform the duties of her job with USEC. On June 24, 2002, Met-Life awarded the plaintiff long term disability benefits.

As required by the Plan, (Plan 125) Satterwhite pursued a disability claim with the Social Security Administration. (A.R. 154-57.) Total disability was awarded to her in early 2003. (*Id.* at 4-5, 139-43.) Per the terms of the Plan, (Plan 125) MetLife began

offsetting the amount it paid to Satterwhite by the amount that she received from Social Security. (A.R. 5.)

Effective April 2004, plaintiff was awarded phase two benefits - those awarded if a claimant is unable to perform any job.  On October 4, 2005, following a review, MetLife notified Satterwhite that it was terminating her benefits effective August 31, 2005. (A.R. 59.)   Plaintiff appealed and, following a second review, MetLife upheld its original decision to revoke Satterwhite's disability benefits in a letter dated December 20, 2005.  Satterwhite filed a complaint in this Court under 29 U.S.C. § 1132(a)(1)(B) for wrongful denial of benefits on August 1, 2006.  Upon a review of the plaintiff's motion for judgment on the pleadings, the Court remanded the case back to MetLife for a full and fair review of the administrative record. *See* September 2007 Decision, Doc. 20.

*B. The District Court's September 19, 2007 Memorandum and Order*

At the risk of over-simplifying the District Court's detailed and careful analysis of the case before it, the undersigned summarizes that the District Court remanded this action to MetLife for a full and fair review because the Court determined MetLife's decision finding plaintiff no longer disabled under the Plan was not the product of a deliberate, principled reasoning process.  The district court found that, in its first decision to terminate benefits, MetLife relied on the analysis of a clinical specialist who did not examine plaintiff and who failed to review plaintiff's entire medical record. (September 2007 Decision at 13).  The Court also found that MetLife improperly faulted the plaintiff for failing to provide certain information regarding her disability when MetLife did not ask for that information. *Id.*  The Court stated, "There is no burden on Satterwhite to proactively prove her disability on a continuing basis..... MetLife cannot

shift its burden of requesting information to Satterwhite and argue that she failed to provide adequate information to support her disability claim." *Id.* at 14.

As to MetLife's second letter denying plaintiff's appeal of its initial determination decision, the District Court found it was arbitrary and capricious for a number of reasons. *Id.* at 18-28. First, MetLife relied primarily on an independent physician consultant who did not examine the plaintiff and who ignored or misconstrued a significant amount of evidence. Second, MetLife also failed to provide a reasonable and rational basis for crediting the non-examining physician consultant over plaintiff's treating psychiatrist, Dr. Meyers. Third, MetLife failed to obtain an independent medical examination of the plaintiff even though it asserted plaintiff had not provided sufficient information and even though the nature of plaintiff's disability, a mental illness, is not subject to objective, quantifiable measurements. Fourth, MetLife, which required plaintiff to file for Social Security disability benefits, gave her award of Social Security benefits no weight. Fifth, the Court found it "extremely compelling" that MetLife revoked Satterwhite's disability benefits although not a single doctor opined that she could return to work." *Id.* at 27.

The Court remanded for a full and fair review of plaintiff's disability claim. In doing so, the Court advised, "The Court is not a medical specialist and cannot say that Satterwhite continues to be disabled. Both MetLife and Satterwhite, however, would be well advised to pursue appropriate medical data." *Id.* at 29. (Internal citation omitted).

### C. Medical Evidence After Remand

Following remand of this case to MetLife, the plaintiff supplemented the record

4

on April 3, 2008 with the following evidence:

### 1. Dr. Tim Larson

Shortly after MetLife's original termination of her benefits, plaintiff moved with her family from Kentucky to Tennessee and changed her mental health care provider from Dr. Meyer to Dr. Tim Larson with Behavioral Health Associates. In his initial, 60 minute interview and evaluation dated September 30, 2005, Dr. Larson stated plaintiff came to him for management of her medications and notes, "Major depression recurrent, partial remission." AR II 304.[1] She was taking Adderall XR 30 mg, Lexapro 10 mg, and Ambien 10 mg every day. AR II 304. Larson noted no suicidal or homicidal thoughts; she was cooperative and well groomed. He noted normal speech and "[h]er mood did not seem to be as depressed as she appeared fatigued." AR II 304. Because she had symptoms of hypothyrodism, Dr. Larson started her on Armourthyroid. Her next appointment was October 26, 2005. Dr. Larson noted plaintiff's mood anxious, being a 5 out of a 10 with 10 being the best, though it was "slightly improved on the thyroid medicine." Her appearance, speech, cognition, thought process and affect were noted as within normal limits. AR II 303. He continued her Lexapro and Ambien prescription, increased the Armour thyroid, and substituted Provigil for Adderall XR. AR II 303. ON October 26, 2005, Dr. Larson indicates plaintiff has been taking Provigil which was prescribed at the last appointment. There is minor improvement on Provigil and plaintiff's mood was fair. Dr. Larson's overall assessment of plaintiff was a 6 out of 10. AR II 302.

---

[1] "AR II" stands for the Administrative Record created after the District Court remanded plaintiff's claim for a second review.

The next treatment note is dated January 17, 2006. Dr. Larson notes plaintiff is sleeping well, the Provigil helps with depression, she enjoys being outside, and there are no symptoms of depression. Mood was "fine," and her overall rating was a 7 out of 10. Dr Larson stated, "I'm not convinced she is disabled. She likely could do some type of work." Dr. Larson found plaintiff stable and directed her to continue her medications. AR II 301.

Plaintiff next saw Dr. Larson on May 16, 2006. He stated she was not having symptoms of depression, but "[w]hat impairs her functioning most is anxiety while out in public. She avoids going places because of it. She used to enjoy being around people in the past. Her sleep, energy, appetite, and concentration are fine." AR II 300. Overall, her assessment rate was 6 or 7 out of 10. Larson noted failed trials of Effexor, Prozac, Paxil, Zoloft, and Wellbutrin. He added Xanax XR .5 mg to regime. (AR II 300).

On June 5, 2006, Dr. Larson spoke with Satterwhite by phone. Larson increased her dosage of Xanax. AR II 299. Plaintiff met with Dr. Larson on June 28, 2006. She was sleeping well, enjoyed being outside, and her mood was fair. Xanax XR was making her sleepy and did not help her anxiety. Dr. Larson gave the plaintiff an assesment of a 7 out of 10 and decreased her dosage of Xanax. She was to continue on her other medications. She also agreed to try psychotherapy with a therapist in his office. AR II 298).

On August 30, 2006, plaintiff's mood was "ok." Dr. Larson added obsessive compulsive disorder as a diagnosis due to handwashing and cleaning. He noted Provigil no longer seemed to be helping. He gave plaintiff an assessment of 7 out of 10. AR II 297.

On November 11, 2006, Dr. Larson noted plaintiff's appearance as "tired" and her mood as "ok." Plaintiff was to continue her medications and talk to her primary physician about possible sleep apnea. AR II 296.

February 13, 2007, Dr. Larson noted plaintiff reported increased stress likely resulting from the care of her mother-in-law with Alzheimer's disease. Her mood was anxious, and her anxiety had increased. She reported she was able to enjoy going for a walk. Dr Larson stated he would add a low dose of Lorazepam. AR II 295. On March 13, 2007, Dr. Larson noted a "much better mood, less anxiety" and "eating and sleeping well." Dr. Larson increased plaintiff's Ativan dosage noting a lower dosage didn't help much. He directed her to continue Lexapro, Ambien, and Lorazepam. Her assessment was a 7 or 8 out of 10. AR II 294.

The last treatment note from Dr. Larson is dated June 15, 2007. Plaintiff reported she is eating and sleeping well. Dr. Larson stated her mood is stable and she has no complaints. His assessment of her status was an 8 or 9 out of 10. She was to continue Lexapro, Ambien, and Lorazepam. AR II 293.

*2. Clinical Social Worker Kathy Scott - July 31, 2007 - February 12, 2008*

At the suggestion of Dr. Larson, plaintiff first went to Behavioral Health on July 31, 2007 for therapy. Progress notes indicate the purpose of therapy was to address anxiety and stress. Plaintiff met on September 11, 2007 with Kathy Scott, a certified clinical social worker at Behavioral Health, noted plaintiff had a sad mood and was tearful throughout the session. They discussed the anxiety and stress plaintiff was feeling helping to care for her mother and the need to stay out of power struggles while paying attention to her own needs and setting appropriate boundaries. AR II 292. On

7

September 25, 2007, Ms. Scott noted plaintiff was experiencing anxiety and intrusive fears. She also had concerns about caring for her mother and mother-in-law. AR II 291. On October 10, 2007, Kathy Scott noted anxiety and intrusive fears. notes she liked to sing. The rest of the note is illegible. On November 27, 2007, Kathy Scott noted fears relating to the deaths of two younger brothers in car accident. Plaintiff was also worried about guns in her granddaughter's day care. She was washing her hands excessively to the point that they were red, cracked and blistered. AR II 290. On January 3, 2008, Kathy Scott noted intrusive fears and worries, anxiety and excessive hand washing. Plaintiff stated she was experiencing difficulty caring for her mother-in-law with Alzheimer's disease. Ms. Scott noted plaintiff's progress was fair. The treatment plan was to continue her medications and work on coping with anxiety. On January 29, 2008, Ms. Scott noted the same symptoms as the last appointment. Plaintiff was also suffering from ulcer related stress. Ms. Scott stated her progress was fair. AR II 289. The last treatment note was dated February 12, 2008. Ms. Scott noted anxiety, insomnia, and social isolation. The plaintiff had not left the house since the last visit except to go to the dentist. plaintiff was experiencing increased anxiety, fears, and worry.

### 3. Psychological Assessment by Sandra L. Kilpatrick, Licensed Clinical Psychologist - March 29, 2008 - AR II 306-310

Dr. Kilpatrick conducted an assessment of the plaintiff on March 29, 2008 which included a 90 minute interview as well as the Beck Depression Inventory, the Beck Anxiety Inventory, the Health Status Questionnaire, and the Quality of Life Inventory. Dr.

8

Kilpatrick found the validity indices of all these assessments were within acceptable ranges. The assessment contained the following: Plaintiff suffered a "nervous breakdown" in October, 2001. Aside from work stress, two events contributed to her breakdown. First, her daughter was a student at the Paducah High School in 1999 where three students were shot and killed and three were wounded. Second, following the attack on the World Trade Center on September 11, 2001, she learned that her place of employment, the Paducah Gaseous Diffusion Plant, the only place in the United States which enriches uranium, was on list of the top 5 targets for the attack.

      Plaintiff reported that the only place she is comfortable is in her home. If she has to leave for any reason, she begins obsessing about it for days, planning her route, and she suffers a "spastic" stomach and insomnia. She washes her hands 15 to 20 times a day, sometimes until they bleed. She becomes very anxious around visitors to her home and cannot sit still. She has no friends. Family has to do the shopping because she cannot go out. She has frequent suicidal ideation though she had no current plan. Counseling and repeated attempts at medication management have been unsuccessful. She reports the only thing that makes her feel better is to stay at home and away from other people, including her husband and two children.

      Dr. Kilpatrick diagnosed Major Depressive Disorder, recurrent and severe; Generalized Anxiety Disorder, Panic Disorder with Agoraphobia, Obsessive-compulsive Disorder, and Post-traumatic Stress Disorder. Her Global Assessment of Functioning (GAF) was 45.[2] Dr. Kilpatrick summarized:

---

      [2]A GAF between 41 and 50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). " <u>Diagnostic and Statistical Manual of</u>

> Based on all of the information described above, [plaintiff] is significantly impaired by her psychological symptoms. Unfortunately, over the last 6-7 years her psychological health has continually declined despite, both multiple psychotropic medications and several different therapists. The current severity of her psychological symptoms is a very serious concern, and needs to be addressed on multiple levels. Given the severity of her depression, her anxiety and the agoraphobia, it is not likely that her ability to sustain consistent work will change in the foreseeable future.

AR II 310.

### 4. Dr. David Meyer's February 6, 2008 Statement

Dr. Meyer is a psychiatrist and certified by the American Board of Psychiatry and Neurology. AR II 349. He treated plaintiff for over three years and last saw plaintiff in July 2005. AR II 349-50. She suffered from chronic and severe depression and had been depressed for two years before he first saw her. AR II 350. Her illness manifested in poor concentration, low energy, loss of interest, loss of pleasure, feelings of hopelessness, worthlessness, and helplessness and feeling anxious and worried. During the course of his treatment of plaintiff, Dr. Meyer has administered the Beck Depression Inventory which indicated she was not exaggerating her symptoms; nor does he think she exaggerated her symptoms over the course of his treatment of her. AR II 352-53. She was in the most ill five percent of patients in his practice. AR II 354-55. He stated, "she is absolutely refractory, and what that means is that she has not responded one iota to anything that's been done, and that's pretty unusual." AR II 356. "I would say that barring some miracle, I think that chronicity predicts chronicity and sadly for [plaintiff] since she did not -- she didn't respond at all to anything, I would be very afraid for her prognosis." AR II 357. He has no reason to believe she was

---

Mental Disorders VI 1994.

10

exaggerating symptoms or malingering. AR II 359-60. During the time he treated her she was unable to work, and the stress of work would probably make her illness worse. AR II 361.

D. MetLife's Review After Remand

*1. Non-Examining Psychiatric Reviewers*

Following remand of the case to MetLife, MetLife declined to obtain its own independent medical examination (IME) and relied instead on file reviews by three non-examining medical sources to reach its decision to deny benefits: an unnamed internal file reviewer in June 2008; hired medical consultant Dr. Salvador Guinjoan, a board certified psychiatrist, in June 2008; and hired medical consultant Dr. Kenneth Busch, also a board certified psychiatrist, in January 2009. None of these reviewers quarreled with Dr. Kilpatrick's IME findings, and appear to agree that, as of the date of Dr. Kilpatrick's examination, Ms. Satterwhite would be unable work based on Dr. Kilpatrick's findings. *Id.* However, each of those sources interpreted Dr. Kilpatrick's findings as reflecting a worsening of Ms. Satterwhite's condition, prior to which she would have been capable of work. MetLife's internal reviewer found that Ms. Satterwhite had improved sufficiently to be capable of work, then did not experience exacerbation of her symptoms resulting in significant functional limitation until July 2007 -- contemporaneous with the therapy appointment in which Ms. Satterwhite was "tearful throughout [the] session"). AR II 255. The two hired non-examining medical consultants went further, finding that Ms. Satterwhite improved as of January 2006, when she first began seeing Dr. Larson, and did not have significant limitations again until March 2008, as of the date of Dr. Kilpatrick's evaluation. AR II 171-72; 251-52.

11

*2. MetLife's June 3, 2009 Decision Terminating Benefits*

Upon review after remand, MetLife concluded the plaintiff was not disabled as of January 16, 2006. MetLife reached this conclusion based on the "mild examination findings" of Dr. Tim Larson while plaintiff was under his care. MetLife did not obtain an IME instead relying upon the evaluation of the unnamed internal file reviewer. MetLife explained:

> In completing our review, we have determined that the medical information on file does not support continuous impairment beyond January 16, 2006. MetLife did not order an independent medical examination and we determined that one was not necessary since our determination that the medical information on file does not support continuing impairment is **based in a large part upon the findings of [plaintiff's] own provider, Dr. Larson: Dr. Larson voices doubts regarding Ms. Satterwhitte's inability to work, and opines that she could perform some kind of work**: Dr. Larson's mental status examination findings, a reliable indicator of the severity of a psychiatric condition, are consistently within normal limits, revealing few if any abnormalities between January 16, 2006 and June 15, 2007. Therefore, another medical evaluation would not be indicated and thus was not necessary, as her own provider during this time frame has provided mild examination findings, and concludes that he has doubts regarding [plaintiff's] inability to work.
>
> While [plaintiff] may have had increased anxiety in May 2006, there was no correlating information to substantiate that this was impairing her to the point of her being disabled from working at any job. Rather, her provider was noting either limited to [or] no abnormalities on mental status examination.

AR II 122-23. MetLife's decision did not mention therapist Kathy Scott's notes. The decision stated at least three times that Dr. Larson had stated plaintiff could perform some type of work. AR II 122, 123.

*3. MetLife's September 19, 2008 Decision Denying Plaintiff's Appeal*

Plaintiff appealed MetLife's decision and on September 19, 2008, MetLife issued

12

its letter informing the plaintiff that it was "reinstating benefits for the closed period of 9/01/2005 to 01/16/2006" but that it had determined plaintiff was not disabled under the Plan as of 1/16/2006. AR II 185, 188. Following a recitation of the evidence, MetLife explained its decision on appeal as follows:

> To further evaluate your claim, we referred your claim to an independent and board certified Neurologist and Psychiatrist for review. The independent Consulting Physician reports evidence of psychiatric functional impairment is noted from the time you went out of work through 01/16/2006. The Independent Physician reports that you showed Improvement after that time, noting only an anxious mood in a 02/2007 office visit, and a consistently normal and improved presentation thereafter until 07/31/2007. ***Information between that time and 02/12/2008 is sporadic and does not provide sufficient detail to make a determination as to your condition or the quality of your care and treatment. It is further noted that, the provider who administered the 02/12/2008 testing relied heavily on your self-report, and did not document any attempt at corroborating this information.*** The Independent Physician concludes that the evaluation to be that of your status on that day, and it could not be used to fill the gaps in the medical information. Similarly, Dr. Meyer, when asked to comment on your condition after not treating you since 07/2005, was basing his comments on his opinion, since he had not seen you since that time. In summary, after careful evaluation of the entire file, we conclude sufficient support for finding a psychiatric functional impairment from the date of disability through 01/16/2006, but conclude that there is no support for a psychiatric functional impairment between 01/16/2006 and 02/11/2008, with minimal supporting evidence of some impairment again on 02/12/2008; reflecting a gap of more than two years. The Independent Consulting Neuropsychiatrist summaries [sic] that the mental and nervous conditions provided above are not supported nor limiting beyond 01/16/2006. ***The Independent Consulting Neuropsychiatrist opined that, from an objective standpoint, based on the conditions that you allege you suffer, it would have been anticipated that the treating providers would have conducted additional testing, for evaluation and treatment, and these could have impacted our claim decision.*** **These include a structured interview, mental status exam, personality testing (Minnesota Multiphasic Personalty Inventory 2 (MMPI 2), Personality Assessment Inventory (PAI) or Millon Clinical Multiaxial Inventory III (MCMI3), cognitive screening (Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) or Trail making test) and validity testing (Test of Memory Malingering (TOMM) or Rey's 15 item testing).** As you know, under the Plan, medical evidence must be submitted to MetLife substantiating the existence and the

13

continuation of a totally disabling condition as defined by the Plan.

* * *

We analyzed the entire file and determined that the records provided sufficient information to determine your ability to perform your own occupation or any other occupation as of 01/16/2006. As noted, under the Plan, medical evidence must be submitted to MetLife substantiating the existence and the continuation of a totally disabling condition as defined by the Plan. ***We note that MetLife decided not to have you examined additionally by a physician of our choice to supplement the information submitted by your treating physicians and the opinions of the independent physicians, because, based on a review of all of the medical records submitted, including the information reflecting your condition on about 1/16/2006, and the medical opinions of all who treated or assessed you, there was not sufficient basis to conclude that an additional medical examination would be temporally relevant, or likely impact our decision as to whether you were disabled on or about 1/16/2006 as would be required for continuing benefits.***

AR II 187-188. (emphasis added).

### III. Analysis

A. Standard of Review

A claim under 29 U.S.C. § 1132(a)(1)(B) for denial benefits is to be reviewed "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the administrator or fiduciary is afforded discretion by the plan, the decision is reviewed under the arbitrary and capricious standard. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006). The parties here agree that Metropolitan Life's Plan affords deference to the administrator. The Court will therefore conduct its review under the arbitrary and capricious standard.

Under 29 U.S.C. §1132(a)(1)(B), a court's review is limited to the administrative

record as it existed when the plan administrator made its final decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378-79 (6th Cir. 2005). The arbitrary and capricious standard is one of the least demanding forms of review. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). "Nevertheless, merely because our review must be deferential does not mean our review must also be inconsequential." *Id.* A court must "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id.* at 172. If the administrative record does not show that the administrator offered a "reasoned explanation" based on substantial evidence, the decision is arbitrary or capricious. *Moon*, 405 F.3d at 379. Substantial evidence means "much more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McDonald*, 347 F.3d at 171.

B. Discussion

Under the terms of the Plan, plaintiff is considered disabled if she remains under the care of a licensed practicing physician and is unable to work at any job for which she might be qualified based on her education, training, and experience. "In order to receive continuing benefits, [she] must furnish periodic medical evidence of [her] illness or injury if requested by the Company." Plan at 123.

MetLife's June 3, 2009 decision, following remand, to terminate plaintiff's benefits effective January 15, 2006 is based, "in large part," on MetLife's conclusion that Dr. Larson, plaintiff's treating psychiatrist, found on January 17, 2006 that plaintiff could work. This conclusion is plain wrong. Dr. Larson did *not* affirmatively conclude that the plaintiff could work. Instead, he expressed doubts about the plaintiff's disability and

15

stated, "[s]he *likely* could do some type of work." AR II 301. He does not identify what type she might be able to do and does not address how she could cope with anxiety relating to leaving her house. Dr. Larson's statement raises questions; it does not resolve them. Given Dr. Kilpatrick's report, the long history of plaintiff's severe illness, her long treatment history with Dr. Meyers and her short treatment history with Dr. Larson, the fact that MetLife appears to have largely ignored Kathy Scott's notes which indicate a greater struggle with anxiety than does Dr. Larson's notes, and given the fact that MetLife choose not to conduct an IME of its own, such a statement is insufficient to support the weight of MetLife's June 3, 2009 decision. Therefore, I conclude this decision that plaintiff was not disabled as of January 16, 2006 is arbitrary and capricious.

As to MetLife's September 19, 2008 decision, some of the problems which the District Court found pervaded MetLife's decision prior to remand continue to pervade MetLife's decision after remand. In its September 2008 decision, MetLife decried the lack of objective evidence of plaintiff's disability, noting specific tests were not conducted which, it contends, would have provided more objective evidence of plaintiff's condition. However, MetLife itself declined to conduct an IME, and it does not appear that MetLife asked plaintiff for the specific tests. it now says plaintiff should have had. MetLife also did not credit plaintiff's statements of her illness made to Dr. Kilpatrick on the ground that they were "self-reported." As discussed by the District Court in its 2007 decision, a psychiatrist typically treats a patient's subjective symptoms which are not easily quantified while a physician can rely on objective clinical findings to treat physical symptoms. (September 2007 Decision at 22.) If MetLife is to discredit the plaintiff's self-

16

reported claims of the severity of her illness, then its refusal to conduct its own IME or at least to specify to the plaintiff the type of tests it wants is unreasonable. Thus, again, MetLife improperly faulted the plaintiff for failing to provide specific information regarding her disability when MetLIfe did not ask for those specific types of tests and chose not to conduct these tests itself. *See September* 2007 Decision at 14 ("There is no burden on Satterwhite to proactively prove her disability on a continuing basis..... MetLife cannot shift its burden of requesting information to Satterwhite and argue that she failed to provide adequate information to support her disability claim.")

After plaintiff moved from Kentucky to Tennessee, she started seeing Dr. Larson for the purpose of managing her medication. She has been and remains on a regime of anti-depressant and anti-anxiety medications since 2001. Many of these medications have proven ineffective and have had to be changed over the course of her treatment. Even though Dr. Larson indicated in his notes that plaintiff was stable and appeared to be doing relatively well, he noted her frequent fatigue and her anxiety, and in August 2007 he made an entirely new diagnosis related to her anxiety: obsessive compulsive disorder. He also felt her condition was serious enough to refer her to a therapist in his office. MetLife correctly notes that Dr. Larson frequently gives plaintiff a7 or 8 out of 10, but it is unclear what that means. The 10 may represent the highest functioning level *anyone* could possibly achieve or it could represent the highest level that the plaintiff could achieve given her conditions. These assessment numbers are not GAF numbers.

The plaintiff saw therapist Kathy Scott from July 31, 2007 to February 12, 2008. During this time, the therapist noted significant anxiety resulting in social isolation and

17

difficulty in leaving the house, obsessive-compulsive hand washing, and intrusive fears. Neither Dr. Larson's nor Kathy Scott's treatment focused on ferreting out whether the plaintiff had the ability to return to work. Rather, it naturally focused on helping the patient cope with her life as she was living it. MetLife now faults the plaintiff for failing to obtain psychiatric evidence conclusive of her assertion that she is disabled. MetLife even goes so far as to name the type of tests she should have had to prove her claim. However, during the majority of the time period in which, according to MetLife, she should have had such tests, the matter was in litigation and the administrative record was closed. During this time, plaintiff was, contrary to MetLife's assertions, under the regular care of a licensed practicing physician to treat her condition. She continued to see Dr. Larson for medical management, took her anti-depressant and anti-anxiety medications, and went to see a therapist at Dr. Larson's suggestion. After remand, when the administrative record was re-opened, plaintiff obtained additional testing geared not to treatment but to providing an in-depth view of plaintiff's capabilities; MetLife did not.

Plaintiff obtained an IME from a board certified psychiatrist, Dr. Kilpatrick, who conducted a face to face examination as well as a number of written tests which do include validity indicators. There is no disagreement that Dr. Kilpatrick's IME supports a finding of disability as of the date the test was given. The disagreement is whether it can support a finding of disability as of January 16, 2006. Plaintiff ably argues that "[d]uring the period MetLife finds Ms. Satterwhite was not disabled prior to Dr. Kilpatrick's exam, Ms. Satterwhite was, in fact, demonstrating precisely the same symptoms noted by Dr. Kilpatrick." (Plaintiff's brief at 18, Doc. 45). There is nothing in

18

Dr. Larson's or Kathy Scott's notes to indicate that the plaintiff was actually functioning at a higher level than when she was tested by Dr. Kilpatrick.  She was not engaging in any more activities than when she was examined by Dr. Kilpatrick or when she was under Dr. Meyer's care. While under Dr. Larson's care, she was socially isolated and she rarely left her home or yard.  As plaintiff states, "it is difficult to start a new job when not leaving the house."

Finally, the undersigned concludes it would be futile to remand this case again for a full and fair review.  Unless an IME an be conducted contemporaneously to the time period that MetLife says plaintiff was not disabled, MetLife will not find that IME temporally relevant.  Further, MetLife continues to fault plaintiff for not providing objective evidence and specific types of tests when objective evidence is not usually available for plaintiff's type of illness.  MetLife also refused to conduct an IME of its own, and MetLife did not ask (again) for the specific tests it now says are missing.  Since it is impossible to go back in time, such tests at this point would be useless.

The undersigned RECOMMENDS MetLife's decision to terminate benefits be REVERSED, and benefits under the Plan be AWARDED.[3]

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).